**FILED**

**DEC 1 0 2002**

~~CLERK~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, 450 Fifth Street, N.W. Washington, D.C. 20549, | CASE NUMBER  1:02CV02421 |
| | JUDGE: Emmet G. Sullivan |
| | DECK TYPE: General Civil |
| Plaintiff, | DATE STAMP: 12/10/2002 |
| v. | COMPLAINT |
| SYNCOR INTERNATIONAL CORPORATION 6464 Canago Avenue Woodland Hills, CA  91367, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission alleges that:

### JURISDICTION

1.      This Court has jurisdiction pursuant to Sections 21(d)(3) and 27 of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u(d)(3) and 78aa.  In connection

with the conduct described herein, the defendant made use of the mails and/or the means or

instrumentalities of interstate commerce.

### DEFENDANT

2.      Defendant Syncor International Corporation ("Syncor") is a Delaware corporation

with its headquarters in Woodland Hills, California.  Syncor is a provider of radiopharmaceutical

products and services both in the United States and, through various direct and indirect

subsidiaries, in 18 foreign countries.  Syncor's common stock is registered with the Commission

pursuant to Section 12(g) of the Exchange Act and is listed on the NASDAQ National Market.

## FACTS

3.     From at least the mid-1980s through at least September 2002, several of Syncor's
foreign subsidiaries made at least $600,000 in illicit payments to doctors employed by hospitals
controlled by foreign authorities.  As described below, these illicit payments were made with the
purpose and effect of influencing the doctors' decisions so that Syncor could obtain or retain
business with them and the hospitals that employed them.  Moreover, the payments were made
with the knowledge and approval of senior officers of the relevant Syncor subsidiaries, and in
some cases with the knowledge and approval of Syncor's founder and chairman of the board.

4.     By making these payments through its subsidiaries, Syncor violated the anti-
bribery provisions of the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA").
Moreover, by improperly recording these payments – and similar payments made to foreign
persons not affiliated with government-owned facilities – Syncor violated the books-and-records
provisions of the FCPA.  Finally, by failing to devise or maintain an effective system of internal
controls to prevent or detect these violations of the FCPA, Syncor violated the internal
accounting controls provisions of the FCPA.

**A.     Taiwan**

5.     Syncor has been doing business in Taiwan since 1985 through a subsidiary called
Syncor Taiwan, Inc.  Syncor Taiwan was and still is Syncor's largest overseas operation in terms
of revenue.  Among other things, Syncor Taiwan sells radiopharmaceutical products to both
private and public hospitals in Taiwan, and owns and operates medical imaging centers in that
country.  Throughout the relevant period, the financial results of Syncor Taiwan were a

2

component of the consolidated financial statements included in Syncor's filings with the Commission.

6. Throughout the time it has been in business, Syncor Taiwan has paid improper commissions to doctors who controlled the purchasing decisions for the nuclear medicine departments of certain hospitals, including some hospitals owned by Taiwan authorities, for the purpose of obtaining or retaining business with those hospitals. These improper commissions (typically between 10% and 20% of sales) totaled at least $400,000 from the inception of Syncor Taiwan through September 2002.

7. During this period, the payment of these commissions was known to and approved by Syncor's founder and chairman, among others at both Syncor and Syncor Taiwan. In most cases, the commissions were paid in cash and hand-delivered to doctors by the brother of Syncor's chairman, who was the general manager of Syncor Taiwan during most of the relevant period until he was promoted in 1998 to manage all of Syncor's Asian operations.

8. These commissions – along with similar commissions Syncor Taiwan paid to doctors at private hospitals in Taiwan – were improperly recorded as promotional and advertising expenses in the books and records of Syncor Taiwan.

9. Beginning in 1998, Syncor Taiwan also paid improper fees to certain doctors at hospitals owned by Taiwan authorities for referrals of patients to medical imaging centers owned and operated by Syncor Taiwan. These referral fees typically were based on a percentage (between 3% and 5%) of the service fees payable to each medical imaging center from the patients referred, and typically took the form of a cash payment that was hand-delivered to the

3

referring doctor by a bookkeeper at the center after funds had been wire-transferred to the center

for that purpose.

10.    During the relevant period, these improper referral fees to doctors at hospitals

owned by Taiwan authorities totaled at least $113,000. The payment of these referral fees was

known to and approved by Syncor's founder and chairman of the board, among others at both

Syncor and Syncor Taiwan.

11.    Like the commissions described above, these referral fees – along with similar

referral fees paid to doctors at private hospitals in Taiwan – were improperly recorded as

promotional and advertising expenses in the books and records of Syncor Taiwan.

**B.    Mexico**

12.    Syncor has been doing business in Mexico since 1995 through a subsidiary called

Syncor de Mexico. In 1998, Syncor de Mexico acquired another Mexican radiopharmaceutical

company whose customers were primarily public hospitals, and the two companies formally

merged during 2001. During the relevant period, the principal business of Syncor de Mexico was

the sale of radiopharmaceutical products and related medical equipment, and its financial results

were a component of the consolidated financial statements included in Syncor's filings with the

Commission.

13.    During 2001 and 2002, Syncor de Mexico and its representatives made

approximately $23,000 in improper monetary payments to at least four doctors at government-

owned hospitals in Mexico, all for the purpose of obtaining or retaining business with those

doctors and the hospitals that employed them. These payments took several different forms,

4

including a personal loan to one doctor that was never repaid, and purported reimbursements of

personal expenses claimed by several of the doctors.

14.    In at least two cases, moreover, Syncor de Mexico entered into "over-invoicing"

arrangements with doctors. Pursuant to these arrangements, Syncor de Mexico would inflate an

invoice and bill the doctor's hospital for a more expensive product than Syncor actually

delivered. After the hospital paid the amount reflected on the inflated invoice, Syncor de Mexico

would pay to the doctor the difference between the actual price and the inflated price, less Syncor

de Mexico's tax liability on the sale.

15.    All of the foregoing types of payments were known to and approved by the

general manager and others at Syncor de Mexico. Many of the payments were hand-delivered to

the doctors by Syncor de Mexico sale representatives after the funds were wired to the sales

representatives' bank accounts. Some of the payments were improperly recorded as business

expenses in the books and records of Syncor de Mexico.

16.    In addition to the above-described payments, Syncor de Mexico had a general

practice of providing "support" – locally referred to as "apoyo" – to doctors with whom it did

business, including many employed at government-owned hospitals. These support payments,

generally between 1.5% and 3% of sales, mostly came in the form of sponsorships for the

doctors' attendance at educational seminars, including payments for registration fees, travel,

lodging, and meals. They also included gifts of computer equipment, software, office furniture,

and medical supplies to doctors and their hospitals; sponsorships of social functions and

fundraisers at the hospitals; funds provided to cover the cost of temporary employees at the

hospitals; and payments made for outside testing when a particular hospital's laboratory equipment was not functioning properly.

17.     During the years 2000 through 2002, Syncor de Mexico made a total of at least $200,000 in support payments, which were arbitrarily distributed among several of Syncor de Mexico's business expense accounts in a manner designed to minimize their detection and disallowance by Mexican tax authorities. This improper characterization of the payments caused inaccuracies in the books and records of Syncor de Mexico.

**C.     Belgium, Luxembourg, and France**

18.     Syncor has been doing business in Belgium, Luxembourg, and France since September 2001 through four subsidiaries collectively operated as the Medcon Group.  The primary business of the Medcon Group is the sale and export of radiological film to hospitals, doctors, and distributors, although it also sells a limited quantity of medical equipment. Customers of the Medcon Group include both government-owned and private hospitals.  During the relevant period, the financial results of the Medcon Group were a component of the consolidated financial statements included in Syncor's filings with the Commission.

19.     During 2001 and 2002, the Medcon Group made several different types of illicit payments to doctors employed by hospitals owned by foreign governments for the purpose of retaining business with these doctors and their hospitals.  First, the Medcon Group gave some doctors generous gifts worth more than $750 each in the form of money directly transferred to doctors' bank accounts, computers, digital cameras, expensive wines, wristwatches, and leisure travel.  In addition, pursuant to agreements with certain doctors, the Medcon Group occasionally sent inflated or fictitious invoices to medical practices and then rebated to the doctors

6

approximately 80 % of the practices' payments, with the funds then being used to finance

personal travel and other gifts for the doctors.

20.    During 2001 and 2002, such illicit payments and gifts to doctors at government-

owned hospitals have totaled at least $45,000, and were known to and approved by the two

principal executives of Medcon who manage the affairs of the business for Syncor.

21.    The Medcon Group also improperly recorded many of these payments and gifts in

its books and records.  It likewise improperly recorded other gifts it gave, and commissions it

paid, to various private parties to obtain competitive advantages, including:  (i) a gift of a laptop

computer given to an employee of one of its major suppliers to induce that supplier to overbid on

a Belgian government contract that was consequently awarded to the Medcon Group; (ii)

commissions of 5% to 10% paid to distributors of the Medcon Group's products in France,

Germany, and Italy; (iii) a payment of approximately $33,000 to a distributor in Greece to induce

him not to compete with the Medcon Group in Belgium and Luxembourg; (iv) commissions paid

to employees of the Medcon Group's suppliers to preserve goodwill and to receive preferential

access to products; and (v) commissions of approximately 80% paid to the principal of one

distributor of the Medcon Group's products to induce him to purchase nearly-expired x-ray film

that would otherwise have to be written off.

22.    The Medcon Group inaccurately recorded many of the above-described gifts and

payments as capital or business expenses, apparently for the purpose of minimizing the risk of

detection and disallowance by tax authorities.  Moreover, the Medcon Group improperly

recorded many of these payments and gifts in the books and records of Syncor's Luxembourg

subsidiary rather than those of its Belgium subsidiary, where they properly belonged, apparently

to take advantage of more favorable tax treatment and more relaxed oversight in Luxembourg.

## FIRST CLAIM
### [Violations of Exchange Act Section 30A]

23.    Paragraphs 1 through 22 are realleged and incorporated by reference.

24.    As described above, Syncor, through certain of its foreign subsidiaries, corruptly

paid money and gifts to doctors at hospitals owned by foreign authorities for the purposes of

influencing their official decisions and inducing them to use their influence with the hospitals to

assist Syncor in obtaining or retaining business.  Throughout the relevant period, the doctors at

these hospitals were foreign officials within the meaning of the FCPA, and the hospitals were

instrumentalities of foreign governments within the meaning of the FCPA.

25.    By reason of the foregoing, Syncor violated the anti-bribery provisions of the

FCPA, as codified at Exchange Act Section 30A [15 U.S.C. § 78dd-1].

## SECOND CLAIM
### [Violations of Exchange Act Section 13(b)(2)(A)]

26.    Paragraphs 1 through 25 are realleged and incorporated by reference.

27.    As described above, Syncor, through its subsidiaries, failed to make and keep

books, records, and accounts which, in reasonable detail, accurately and fairly reflected its

transactions and dispositions of its assets.

28.    By reason of the foregoing, Syncor violated the books-and-records provisions of

the FCPA, as codified at Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CLAIM
### [Violations of Exchange Act Section 13(b)(2)(B)]

29.    Paragraphs 1 through 28 are realleged and incorporated by reference.

30.    As described above, with respect to improper payments to foreign officials and others, Syncor and certain of its foreign subsidiaries failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

31.    By reason of the foregoing, Syncor violated the internal accounting controls provisions of the FCPA, as codified at Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

9

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Final Judgment

ordering defendant Syncor to pay a civil penalty pursuant to Exchange Act Sections 21(d)(3) and

32(c) [15 U.S.C. §§ 78u(d)(3) and 78ff(c)], and granting such other relief as the Court deems

appropriate.

Respectfully submitted,

Paul R. Berger
Russell G. Ryan (DC Bar No. 414472)
Nina B. Finston
Jason P. Lee
Stephen G.Yoder

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0806
(202) 942-4660 (Ryan)
(202) 942-9630 (Ryan fax)

Dated: December 10, 2002